Argued 2 February; decided 16 February, 1903.

**BAUM *v.* RAINBOW SMELTING.**

[71 Pac. 538.]

NECESSITY OF PROVING SIGNATURES TO WRITINGS.

1. A paper sent to one of two persons for both to sign, and which was returned with the signatures of both, is not admissible against the other, his signature not being established as genuine, or shown to have been made by one authorized to make it.

CONSTRUCTION OF WRITING—PAROL EVIDENCE.

2. A written agreement, "We do hereby give one third interest in mining claim 'Rainbow,' Rainbow district," without any acknowledgment, is not a deed, a grant, or a contract to convey, but is part of an agreement, the rest being in parol, and the writing is not conclusive as to what the agreement actually was.

From Douglas: JAMES W. HAMILTON, Judge.

This is an action by J. H. Baum against the Rainbow Mining, Milling & Smelting Co. to recover an undivided one third interest in two certain quartz mining claims, located jointly by Robert W. Thomason and Lawrence Cantile, known as "Rainbow Claim No. 1" and "Rainbow Claim No. 2;" the latter being an extension of the former, and located upon the Rainbow vein, a lode of mineral-bearing rock in place, situated near Drew's Creek, a tributary to Elk Creek, in Douglas County, Oregon. Each party claims the legal title, and to have de-

raigned from Thomason and Cantile.  The case proceeded to trial before a jury, and, when the plaintiff rested, the defendant moved for a judgment of nonsuit; and the trial court having allowed the motion, and rendered judgment dismissing the action, the plaintiff appeals.        Affirmed.

For appellant there was a brief and an oral argument by *Mr. Albert Abraham,* to this effect:

I. Until January, 1899, mining claims were not real estate in Oregon; they were rights resting upon possession only; they did not amount to an interest in lands; they were not within the statute of frauds, and no other conveyance than a transfer of possession was necessary to pass them: Laws, 1898, p. 18; *Duffy* v. *Mix,* 24 Or. 265 (33 Pac. 807) ; *Herron* v. *Eagle Min. Co.* 37 Or. 155, 157 (61 Pac. 417) ; *Omar* v. *Sopir,* 11 Colo. 380 (7 Am. St. Rep. 246) ; *Table Mt. Tunnel Co.* v. *Stranahan,* 20 Cal. 198; *Patterson* v. *Keystone Min. Co.* 23 Cal. 575; *King* v. *Randlett,* 33 Cal. 318; *Blodgett* v. *Potosi Co.* 34 Cal. 227.

II. All defects in the conveyance to Baum were cured by the act of 1899 : Laws 1899, p. 63, § 1.

III. A ''mining claim'' may consist of several locations.  It may be known by a different name than any of those under which it was located.  Parol or extrinsic evidence is admissible to explain what is embraced by it: Lindley, Mines, § 327; *Helm* v. *Chapman,* 66 Cal. 291 (5 Pac. 352) ; *Tredinnick* v. *Red Cloud Min. Co.* 72 Cal. 78, 84 (13 Pac. 152) ; *Malone* v. *Big Flat G. Min. Co.* 76 Cal. 583 (18 Pac. 772) ; *St. Louis Smelt. Co.* v. *Kemp,* 104 U. S. 636; *McFeters* v. *Pierson,* 15 Colo. 201 (24 Pac. 1076, 22 Am. St. Rep. 388) ; *Northern Pac. R. Co.* v. *Sanders,* 49 Fed. 129, 135; *In re Mackie,* 5 L. D. 199; *Bewick* v. *Muir,* 83 Cal. 368, 372 (23 Pac. 389).

IV. When mining claims have well-known names, whether they are the names of the claims as located or names of invalid locations, or popular names, the name is a sufficient description, and extrinsic evidence is admissible to explain what they include: Berringer & Adams, Mines (1 ed.), 339, 340; *Philpotts* v. *Blasdell,* 8 Nev. 61; *Weill* v. *Lucerne Min. Co.* 11 Nev.

200; *Lebanon Min. Co.* v. *Consolidated R. Min. Co.* 6 Colo.
was located.   Parol or extrinsic evidence is admissible to ex-
371; *House* v. *Jackson,* 24 Or. 89 (32 Pac. 1027); *Smith* v.
*Shattuck,* 12 Or. 362 (7 Pac. 335).

V. It is not necessary to express the consideration in a deed,
unless the granting words are "bargain and sell." Even then
the consideration may be shown by extrinsic evidence, and
when so shown it is sufficient: *Lambert* v. *Smith,* 9 Or. 185;
Devlin, Deeds, § 830; Boone, Real Prop. (2 ed.), § 292; *Cun-
ningham* v. *Freeborn,* 11 Wend. 248; *Jackson* v. *Dillon,* 2 Over.
261; *Wood* v. *Beach,* 7 Vt. 522; *Jackson* v. *Pike,* 9 Cow. 69;
*Jack* v. *Dougherty,* 3 Watts, 151; *Redfield, etc., Mfg. Co.* v.
*Dysart,* 62 Pa. St. 62.

VI. So, too, 'a gift' may be good without consideration, be-
ing in effect a deed of feoffment: *Lambert* v. *Smith,* 9 Or. 185:
*Meyers* v. *Farquharson,* 46 Cal. 191.

For respondent there was an oral argument by *Mr. Andrew
M. Crawford,* with a brief over the names of *Mr. Crawford*
and *Commodore S. Jackson,* to this effect:

I. Said writing conveyed no title to plaintiff and was not
even a contract to convey, and it was the duty of the court to
construe the same as to its legal effect, and the court did not
err in so doing: Hill's Ann. Laws, §§ 3002, 3011; Laws 1898,
p. 17, § 7; *Hartenberg* v. *Bacon,* 33 Cal. 356, 380; *Copper Hill
Min. Co.* v. *Spencer,* 25 Cal. 19-26; Tiedeman, Real Prop.
§§ 786, 787, 788.

II. The curative act of 1899, Laws of Oregon, pp. 63, 182,
does not cure a failure to seal, nor dispense with consideration
or a sufficient description, and the legislature cannot make
valid an instrument which was void at its execution: *Denny*
v. *McCown,* 34 Or. 48 (54 Pac. 952); Hill's Ann. Laws, §§ 756,
781, 785, subd. 6; *Corbett* v. *Salem Gaslight Co.* 6 Or. 405-408;
*Johnston* v. *Wadsworth,* 24 Or. 494-502 (34 Pac. 13); Tiede-
man, Real Prop. § 808; *Gordon* v. *City of San Diego,* 101 Cal.
522 (40 Am. St. Rep. 73, 36 Pac. 18); Cooley, Const. Lim.

p. 457; *Summer* v. *Mitchell,* 29 Fla. 179 (30 Am. St. Rep. 106, 14 L. R. A. 815, 10 So. 562).

III. Description in paper is insufficient, and same is void for uncertainty: Tiedeman, Real Prop. § 788; *Fernandez* v. *Burleson,* 110 Cal. 164 (42 Pac. 566, 52 Am. St. Rep. 75) ; *Peck* v. *Mallams,* 10 N. Y. 509-532; Barrenger & Adams, Min. Law, 339, *et seq.*; Devlin, Deeds, § 32; *House* v. *Jackson,* 24 Or. 89, 97 (32 Pac. 1027) ; *Willamette Falls Locks Co.* v. *Gordon,* 6 Or. 175.

IV. The law protects the possession of a *bona fide* purchaser for a valuable consideration: *Arnold* v. *Hagerman,* 45 N. J. Eq. 186 (14 Am. St. Rep. 712, 17 Atl. 93) ; *Evans* v. *Templeton,* 69 Tex. 375 (5 Am. St. Rep. 71, 6 S. W. 843). ·

V. Defendant had no notice, actual or constructive, and if plaintiff's Exhibit 1 can operate as a deed, it should have been recorded to give notice, and, not being recorded and defendant having no knowledge thereof, defendant's title cannot be affected thereby: Hill's Ann. Laws, § 3627; *Lake* v. *Hancock,* 38 Fla. 53 (56 Am. St. Rep. 159, 20 So. 811) ; *Doran* v. *Dazey,* 5 N. D. 167 (57 Am. St. Rep. 550, 64 N. W. 1023) ; *Smith* v. *Worster,* 59 Kan. 640 (68 Am. St. Rep. 385; 54 Pac. 676).

VI. When, assuming that all the testimony adduced by plaintiff is true, the same does not support his issue, or would not authorize a jury to find a verdict for him, or if the court would set it aside if so found, as contrary to evidence in such case, it is the duty of the court to grant a nonsuit: Hill's Ann. Laws, §§ 241, 246; *Ringold* v. *Haven,* 1 Cal. 109-115.    Affirmed and approved in *Dalrymple* v. *Hansen,* 1 Cal. 135; *Ensminger* v. *McIntyre,* 23 Cal. 593; *Masten* v. *Griffing,* 33 Cal. 111; *Grant* v. *Baker,* 12 Or. 329 (7 Pac. 318) ; *Cogswell* v. *Oregon & Cal. R. Co.* 6 Or. 416-423.

VII. There being no record or other evidence of plaintiff's alleged interest, and no evidence that defendant had any knowledge that plaintiff claimed any interest whatever, and plaintiff having admitted that defendant was a purchaser in good faith, for a valuable consideration, and in possession of the premises, without notice of any claim of plaintiff, the mat-

ter became a question of law for the courts: Hill's Ann. Laws, § 3027; *Baker* v. *Woodward,* 12 Or. 3, 16 (6 Pac. 173); *Walker* v. *Goldsmith,* 14 Or. 125, 148 (12 Pac. 537); *Manaudas* v. *Mann,* 14 Or. 450-452 (13 Pac. 449); *Meacham* v. *Stewart,* 19 Or. 285 (24 Pac. 241); *American Mort. Co.* v. *Hutchinson,* 19 Or. 334-351 (24 Pac. 515); *Riddle* v. *Miller,* 19 Or. 468-469 (23 Pac. 807).

MR. JUSTICE WOLVERTON delivered the opinion of the court.

The single question involved is, was the trial court in error in granting the nonsuit? To determine this requires a brief statement of the evidence adduced pertinent to plaintiff's cause: The plaintiff testified in substance, that he first went on the property in November, 1898; that he was out looking for magnesia ore and was referred to Thomason as a competent guide; that he made arrangements with him, as such, to take him to the locality of the deposits; that while on the way Thomason took some ore from his pocket and inquired of the witness what it was, and, being informed that it was copper ore, replied, "I have a little prospect over on the other side of the mountain," and requested witness to examine it for him; that, after going to the magnesia deposits, they went to the copper prospect; that Thomason showed witness where he had made a little cut three or four feet in width; and, employing his own language, the witness continued as follows: "He says, 'What do you think of that?' and I says: 'This only shows that there is mineral here. Can you show me any better showing than that?' and he says, 'Yes;' and we went up on the croppings, and I saw there a vein about sixteen inches to twenty-four inches right in casing,—right in place; and I told him that he had probably a good thing here, and he said that he did not know what he had, and would like to know, and I told him that he had a very good prospect, for the showing made so far. He says, 'If you want to go into this matter, you can buy an interest in here for about $300;' and I told him that that was out of the question; that I did not have the

money to spend that way; and I told him that I thought I could place this before capital. 'Well,' he says, 'do you think you can do that?' and I told him I thought I could, 'as you have the ore right there in place;' and he says: 'If you will place this before capital, I will give you a one third interest in the two claims.' He says, 'I have got one, and Cantile has got the other;' and I says: 'That is all right. I will do the best I can to place this before capital.' We talked there for a while, and he said he thought there had ought to be a little better showing made, and I says that it will take considerable money to open up this proposition. I says, 'You know what you have got, as the ore is right on top, and if you follow that right down, and make a little cut, you will expose the face of the ledge;' and he said he thought that was right, and, if I was able to help out a little, they could do that; and I says, 'What can you do with a little money?' and he says, 'What do you mean by a "little money"?' and I says, 'twenty dollars.' He says, 'We could run in here twenty or thirty feet with twenty dollars.' I says, 'Do you really mean that?' and he says, 'Yes.' I says, 'If that will help you out any, I will do that, so as to help you to make a better showing;' and this was agreed on finally, there and then, and we went down to the cabin again, and got the horses and went on down to Volzines. In the mean time he went on, and says, 'I will see you at the post office down at Perdue's.' So he came down there, and everything was all right. I took some samples right from the croppings. I took about thirty-five pounds, I should judge. I took that along with me, and I told him that I would have them assayed for him, to see how high they would run in copper. So we came down, and I left him at the post office, and he said that it would be all right; and then I came down to Portland, and had the samples assayed, and I think they ran at that time about 9 per cent in copper. Those samples were taken right from the croppings.''

Witness further stated that he had an assay made of the ore in Portland, and sent them a certificate of its value; that he

paid for the assay; that he did not see Cantile at the time; that Thomason did the talking; and that he received a letter later from them, wanting more money, whereupon witness was interrogated and answered as follows: "Q. What arrangements did you have with them about putting up the money? A. I asked him how much he wanted when I was there, and he said, 'Twenty dollars,' and I said, 'All right, I would send him that,' and I did; and that was to be used for the purpose of making a better showing, so that I could place it before capital. Q. What agreement did you have with them in regard to this sixty-five dollars? A. After I came back home, he wrote to me and wanted more money,—wanted something like twenty dollars,—and I sent that amount; and he said when I came down I could give him the balance, of twenty-five dollars. Q. What was to be done with that money? A. That was to be used in development work. I furnished this money for the expenses of the development work. They were to do the labor themselves free of charge. Q. Did you ever agree with them to give them any money for themselves? A. No; no money at all. They were to furnish their own labor. Q. When was it intended that you should have this one third interest,—after you sold the mine, or at that time? A. At that time. I was to receive it right on the ground. They told me they would give me this one third interest if I would place the property before capital, and I was to do my best efforts to place this property; and then, after that, this question about the money came up,——the question as to what he could do if he had twenty dollars. Q. State what this is: (Witness was handed paper marked 'Plaintiff's Exhibit 1,' for identification.) A. After I sent that twenty dollars, I thought I would get an agreement in writing from them. I already had one verbally right at the mines. So I sat down at one of the hotels in Portland and wrote this out, and had them both sign it and send it back to me. Q. Are you familiar with Thomason's signature? A. Yes, sir; that is Thomason's signature. Q. Do you know the other signature? A. It is Cantile's name, but I do not

know whether he signed it or not. Q. You received that back through the mails? A. Yes, sir. * * Q. You may state the circumstances of your going into possession of that property under that instrument after it was signed. A. In March, 1900, I was in Sumpter, and I received a letter from Mr. Thomason, saying that he had struck very rich ore, and wanted me to come there. In fact, he sent me a sample, which I had assayed at that time, and it went 17 per cent. About a week after I received the letter I returned to Portland, and came on down, and arrived at the property about the first part of March, and met Mr. Thomason at the Perdue post office, and we went up to Mr. Furlong's and had lunch; and I asked him if he had powder and caps, and he said he had enough to put in three or four shots; and we started up and stayed overnight in his mother's house, and the next morning we went up and went to the cabin and made arrangements to stay there overnight (that is, the cabin at the mines), and then we went up to the property. Q. Did you go on the property? A. Yes, sir. Q. What did you do on the property? A. As I stated, we took the powder and caps and tools along, and worked there. Q. Did you work there? A. Yes, sir; I shoveled out some of the ore, and held the drill for a while. Q. What acts of ownership did you exercise over it at that time? A. I exercised ownership of a one-third interest in the two claims. Q. You did work on them? A. Yes, sir; I worked there two and a half or three hours that afternoon, and we got out different samples of the ore. I helped Mr. Thomason there, and then, later on, his brother came up and helped, and I was there at the time. Q. In what capacity were you regarded, as to the title of that property while you were there? A. I was working there on the property as an owner, and I came there to see the property, and see if I could recommend it to capital; and at that time it was all right, and he said that I had my interest in it. Q. What view did Mr. Thomason take of it? A. We agreed right then and there that there was enough work done there to show the property up to capital. Q. Have you ever abandoned your rights

there?   A. No, sir; never.  *  *  Q. Now, this mine mentioned
in that agreement there,—what is the well-known name of that
mine?   A. 'Rainbow mine,' No. 1 and 2.   Q. The language in
that instrument, 'Rainbow claim,—what is meant by 'Rainbow
claim?'   A. Rainbow No. 1 and Rainbow No. 2,—the two
claims that I had an interest in.''

L. L. Perdue, a witness for plaintiff, testified that he resided
at Perdue, Oregon, and was postmaster there, and, being inter-
rogated regarding the signatures to plaintiff's Exhibit 1, he
replied that he would not be positive as to the signature of
Cantile thereto attached; that he might have signed it, but that
he was not sufficiently acquainted with his handwriting to iden-
tify it as his, but recognized Thomason's signature as genuine.
The paper marked ''Exhibit 1,'' and introduced in evidence, is
plaintiff's alleged muniment of title, and is as follows:

''We, the undersigned citizens of the United States, resi-
dents of Douglas County, do hereby give J. H. Baum one third
interest in mining claim Rainbow, Rainbow District, this 18th
day of January, 1899.                     R. W. Thomason,
''Witness: Leon L. Perdue.             L. Cantile.''

1. This is all the testimony having any material bearing
upon the question at issue, as we understand the controversy.
The writing was admitted in evidence so far as it purported to
be the act of Thomason, but not as to Cantile; the signature of
the latter not having been established as genuine, nor shown
to have been subscribed by competent authority.   An excep-
tion was saved to the ruling of the trial court in this respect,
but we do not deem it well taken.   No witness saw Cantile sign,
or identified the signature to be in his handwriting, and no
attempt was made to show that his name had been subscribed
by another with his authority; so that the instrument, what-
ever may be its legal effect, cannot operate to devest Cantile of
any interest he may have originally possessed in the mine.

2. But plaintiff's counsel, notwithstanding, contend that the
writing is, in effect, a present deed or grant of an undivided
one third interest in both claims, and that the description con-
tained therein is sufficient, with the extraneous proofs, to con-

vey the title to the whole, and, further, that it is competent to
supply the omission to express a consideration therein by parol
proof, and that such as was offered is quite sufficient and ade-
quate for the purpose of validating the grant.   Whether or
not the description is such as may be aided by evidence *ali-
unde,* it is not necessary for us to determine at this time, and
we will therefore direct our discussion to a consideration of
the nature of the instrument, in the light of the evidence ad-
duced.   We are impressed with the belief that it is without
validity as a deed or grant, and that it can have no greater
effect than a contract to convey, if it may even be said to be
effective for that purpose.   As a contract to convey, it is
manifestly insufficient to support plaintiff's action, because it
is not such a muniment as invested him with the present legal
title, which is necessary for the maintenance of an action at
law to recover possession of real property.   Thomason made
the proposition to plaintiff to sell an interest in the mine for
$300, which the latter declined because he did not have the
ready money, but indicated that he thought he could place it
"before capital," and Thomason replied: "If you will place
this [the mine] before capital, I will give you a one third inter-
est in the two claims."  To this plaintiff answered: "That is all
right.   I will do the best I can to place this before capital."
Briefly stated, this is the substance of the verbal understand-
ing to be extracted from the evidence, namely: The offer, on
the one hand, coupled with a condition, and an acceptance on
the other.   Following this, plaintiff agreed to advance $20,
not as a consideration, but to help in development work, so as
to expose the ledge and make a better showing, and thereby
to induce capital to take hold of it.   He took some samples of
the ore away with him, and on November 17th had an assay
made in Portland, reporting the result to Thomason.   Some
correspondence followed, relative to money for the develop-
ment work; and plaintiff advanced $20, and at the same time
forwarded the writing in question for the signatures of Thom-
ason and Cantile, probably intending to reduce to writing the
whole of the verbal agreement theretofore consummated.   This

writing was returned to plaintiff in its present condition. When asked at what time it was intended that he should have his interest, he replied: "At that time, I was to receive it right on the ground. They told me they would give me this one third interest if I would place the property before capital, and I was to do my best efforts to place this property."

Plaintiff was not put in possession at the time, and makes no claim to have so entered in pursuance of the agreement until some time near the 1st of March, 1900,—about a year and five months after the alleged verbal understanding was had,—at which time, he relates, he went upon the mine, and engaged in work upon it by shoveling and holding the drill two and one half or three hours, and obtained some additional samples, which proved to be much more valuable than the first, assaying 17 per cent in copper. According to his statement, he then worked upon the property as owner, and counsel now urge that he was thereby placed in possession. It is not questioned that defendant subsequently excluded him therefrom. Now, does this disclose a consideration sufficient to uphold the writing as a deed or grant to a one third interest in the mine? Although plaintiff testified subsequently that he was to use his "best efforts to place this property," it was merely his own construction of the agreement; and we must, notwithstanding, assume that he was either to induce some one or more persons with capital to purchase, or to make advances upon some such consideration as an interest in the mine, or to furnish means for its development and operation upon some arrangement whereby the owners would profit by his services, and not that he was merely to disclose or lay the fact before persons possessing capital that Thomason and Cantile had or were possessed of such and such a mining prospect in copper ore, as otherwise we would have a perfect exemplification of a *reductio ad absurdum*. No person of ordinary understanding would enter into any such an arrangement. Upon the other hand, Thomason and Cantile's performance depended upon plaintiff's observance of his undertaking; the word "if" being employed, which is always expressive of a condition. The writ-

ing, considering it to have been signed by both Thomason and
Cantile, voices but one side of the verbal understanding, for
plaintiff, referring to his purpose, said while on the stand: "I
thought I would get an agreement in writing from them. I
already had one verbally right at the mines, so I sat down in
one of the hotels in Portland and wrote this out, and had them
both sign it and send it back to me." Now, in supplying the
necessary consideration, it is developed that there is indissolu-
bly coupled therewith a condition upon which the grant is de-
pendent, which the plaintiff has manifestly not performed, so
that, viewing the matter most favorably to him, he has not
shown himself entitled to the legal estate—much less demon-
strated that the alleged muniment vested him therewith. If
such a consideration had been set out in the instrument, no one
would venture to claim that it operated as a present grant. It
would then read, in effect, as it does now, with this important
addition: "Provided the said Baum shall place the mine 'be-
fore capital.' " The condition is so coupled with the consid-
eration that the grant cannot become effective until it is per-
formed, and that it rests in a verbal understanding can make
the writing no more effective to convey a present interest than
if it had been fully set out therein. The agreement is not a
specialty, being without a seal, and does not, within itself, im-
port a consideration. Whatever possession plaintiff may have
obtained was in pursuance thereof, and not as an independent
transaction, so that there was no such transfer of possession as
to vest plaintiff with the legal title, if it be conceded that it
could have been so vested at the time. The testimony offered
relative to the consideration did not contradict in any way the
terms of the writing, and served only to show what the parties
had in mind when the agreement was entered into, and to
prove the terms of that part of the understanding which was
not subsequently reduced to writing; and it was competent for
that purpose, as well as to show the precise nature of the con-
sideration intended for its support. These deductions are
borne out by judicial interpretation: *Chase* v. *Senn* (Com.
Pl.), 13 N. Y. Supp. 266; *Rutland & B. R. Co.* v. *Crocker,* 4

Blatchf. 179 (Fed. Cas. No. 12,176); *Taylor* v. *Dansby,* 42 Mich. 82 (3 N. W. 267).

We have thus treated this case because it is further urged that, by reason of the curative act of the legislature of 1899 (Laws 1899, p. 63), this instrument became operative as a deed, notwithstanding the informality of its execution. It follows that the judgment of the trial court should be affirmed, and it is so ordered.    AFFIRMED.

Decided 11 August, 1902.